## GENERAL ELECTRIC CO. v. OHIO BRASS CO.[*]

(District Court, D. New Jersey.   October 28, 1920.)

### No. 8113.

Patents ⬅328—925,561, for suspension of high-tension line, not infringed.
    Buck and Hewlett patent, No. 925,561, relating to "suspension of high-tension lines," *held* not infringed.

In Equity.   Bill by the General Electric Company against the Ohio Brass Company.   Bill dismissed.

Fish, Richardson, Herrick & Neave, of New York City (Charles Neave, Clarence D. Kerr, and William G. McKnight, all of New York City, of counsel), for plaintiff.

Charles M. Nissen, of Chicago, Ill. (Drury W. Cooper, of New York City, of counsel), for defendant.

LYNCH, District Judge.   The plaintiff alleges infringement by the defendant of its Buck and Hewlett patent, No. 925,561, which relates to "suspension of high-tension lines."   The defendant not only denies infringement, but attacks the validity of the patent.   The claims of the patent in issue are Nos. 1, 2, 3, 4, and 6.

"Suspension of high-tension lines" means the manner of suspending wires for the transmitting of electricity at high voltage from the place where it is generated to the place where it is to be used.

It is asserted, in behalf of the plaintiff, that prior to the application for the patent in suit an increase in voltage in long-distance transmission systems was a thing very much to be desired.   These systems started at very low voltages, and they got up gradually to 20, 30, 40, 50, and 60 thousand volts to be transmitted long distances, and the system in use in those days carrying a voltage as high as 60,000 was the old

---

familiar combination of telegraph pole, cross-arms, wooden pins sticking out of the cross-arms, and glass or porcelain insulators on the top of the wooden pins, to which insulators the passing electric wire was fastened. As the voltage was increased the size of the insulators was also increased. Various shapes of insulators were used to which the wires were fastened.

It does not seem to be disputed that it was not only possible, but the general practice, to conduct up to 60,000 volts of electricity over this old system.

So Buck and Hewlett in 1907 "invented certain new and useful improvements" in suspension of high-tension lines, and in their specifications and claims stated as follows (underlining mine):

"The present invention relates to overhead suspension of electric conductors *and more especially to conductors of power circuits of high potentials from 60,000 to 100,000 volts.*

"Heretofore it has been the standard practice to provide the poles or cross-arms with pins upon which were placed vertical insulators to which the conductors were directly and rigidly attached. These insulators, in order to adapt them for use with high potential circuits, were made up by superposing a plurality of petticoats one above the other, the number of such petticoats varying with the voltages of the currents, and accordingly the insulators for use with high potential circuits were necessarily of large dimensions, the dimensions varying with the cube of the potential above 60,000 volts. Besides being expensive, these old forms of insulators were objectionable on account of the leverage strains which any side motion of the conductor imposed thereon. * * * Where the conductor wire is rigidly attached to the insulator, as has been the practice heretofore, it soon becomes crystallized near the point of attachment due to the swaying of the conductor span under the influence of the wind. Furthermore, it has been the practice to support a conductor in short spans in order to relieve the insulators of the excessive leverage strains, and as a consequence a large number of expensive poles or towers have been necessary.

"The object of this invention is to provide a system whereby a high potential conductor may be effectually and reliably supported and insulated at a reasonable cost.

"In carrying out our invention, *we do away with the usual insulators and their pins* and provide at *certain* of the supporting towers a *vertical series of insulators flexibly connected to each other and* attached by a hook joint at the upper end to the under side of a cross-arm of the tower and at the lower end by an ear or other suitable connection to the suspended conductors. *At certain other towers the conductor is dead-ended* through a horizontal series of flexibly connected insulators on each side of the cross-arm and a jumper connection joins the dead ends of the conductor and *hangs freely by gravity below the cross-arm.* The dead-ending of the conductor will occur at angles in the conductor in order to take the side stress due to change in direction thereof, *and is preferably used at least at every fourth or fifth tower* on tangents or straight sections in order to prevent longitudinal waves of the conductor due to wind. * * *"

Claim 1. "In a system of *high-tension lines suspension, the combination of periodically dead-ended spans joined by jumper connections* and *intervening spans freely suspended* beneath cross-arms of the supporting towers."

Claim 2. "In a system of suspension for high-tension power circuits, the combination of conductor spans dead-ended at the cross-arm through two chains of *insulators flexibly connected to each other* and to the cross-arm and a jumper connection between the adjacent ends of the spans and *hanging freely by gravity* beneath the cross-arm."

Claim 3. "In a system of high-tension line suspension, the combination of *periodic spans dead-ended* on opposite sides of a cross-arm or support through series of insulators flexibly connected and electrically connected by depending

jumper wires and intervening spans *freely suspended* beneath cross-arms of the respective supporting towers."

Claim 4. "In a system of high-tension line suspension, the combination of spans *each dead-ended* to its cross-arm through *series of flexibly connected insulators*, each series of connected insulators having flexible connection with the supporting cross-arm."

Claim 6. "In a system of high-tension line suspension, the combination of towels provided with the cross-arms of conductor *spans freely suspended beneath said cross-arms* by series of flexibly connected disk insulators.

The particular instance of infringement set out in the prima facie case of the plaintiff relates to a certain construction in the Sanitary District of Chicago, Ill. The system of suspension in use in this Chicago district was primarily a pin insulator system, a system recognized by the patent to be the standard system for suspension for the transmitting of circuits of high potentials up to 60,000 volts. For some time the only wires strung along the poles of the Sanitary District were wires fastened to insulators pinned on cross-arms, these wires transmitting from 40,000 to 44,000 volts. Necessity required the placing of three additional wires on the existing poles, and, there not being sufficient space on the cross-arms to place three additional pin insulators, it was decided to place one pin insulator on the top of each pole over which one of the additional wires was strung and suspended underneath the lower cross-arm of each pole two sets of insulators and underhang one wire to each of these sets. In this manner the three additional wires were provided for. These wires were intended to and did transmit the same amount of voltage as the wires strung across the top of the cross-arms, namely, 40,000 volts.

The defendant had nothing to do with the original construction or maintenance of the Chicago sanitary system, nor did it have anything to do with the fixing of the amount of voltage to be carried by any of the wires running along that system. It merely manufactured and sold, among other electrical appliances, insulators, and these insulators were used for various purposes such as guying poles, wireless work, dead-ending, and other forms of suspension.

When the three extra wires were added to the sanitary system the defendant furnished the insulator units which were hung underneath the lower cross-arms of the poles for the purpose of suspending the two underhung wires, and it is this contributing act—selling these units in series of three for use in the sanitary system—which the plaintiff urges amounts to infringement.

The patent in suit is a combination of well-known elements. Insulators, wires, cross-arms, poles, all of the parts of the patented combination, as well as the practice of dead-ending, were well known in the prior art, and the only invention, assuming that there was an invention, was in their new arrangement.

"A combination is a composition of elements, some of which may be old and others new, or all old or all new. It is, however, the combination that is the invention, and is as much a unit in contemplation of law as a single or noncomposite instrument. Whoever uses it without permission is an infringer of it. Whoever contributes to such use is an infringer of it." Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U. S. 325, 29 Sup. Ct. 503, 53 L. Ed. 816.

"When the terms of a claim in a patent are clear and distinct, * * * the

patentee, in a suit brought upon the patent is bound by it." Keystone Bridge-
Co. v. Phœnix Iron Co., 95 U. S. 274, 24 L. Ed. 344.

Buck and Hewlett made it plain that their invention related to the
mechanical system of arranging electrical units, not in the individual
characteristics of those units. The claims were specific and to the
point.

Should not the patent in suit, if valid, be confined to the sphere which
it intended to cover; that is to say, should it not be restricted to its
particular features?

So in considering the question of infringement the court must com-
pare the claims of this patent with the features of the two underhung
wires of the Chicago sanitary system.

I find:

(1) That the first claim relates to a system of high-tension lines sus-
pension. The system of high-tension lines suspension contemplated
by the patent, as I construe the definition in the patent itself, rates
as a high potential a line carrying from 60,000 to 100,000 volts. The
system of the Sanitary District had a potential of approximately 40,-
000 volts. This system, as well as other systems, had been successfully
operated by pin insulators, and underhung wires were only placed on
the poles when additional wires were necessary and there was no room
for them on the pin insulators attached to the top of the cross-arms.

(2) The first claim reads "periodically dead-ended spans joined by
jumper connection." There are no "periodical dead-ended spans" in
the Sanitary District, but there were spans occasionally dead-ended
over railroad crossings. In the prior art it was an old practice to dead-
end at railroad crossings, streams, and the like, and the sanitary
system showed only the old art in this respect.

There was a reason for the periodical dead end in the plaintiff's
patent. Free suspension under the cross-arm was used in four out of
every five spans, and in order to avoid a swaying of the conductor as
stated or periodical intervals they dead-ended these wires and put ten-
sion on them in the longitudinal direction to keep them from sway-
ing. In the Sanitary District that function is entirely absent, because
the dead ends are eliminated along the whole line except at railroad
crossings.

(3) Taking up the two wires of the Sanitary District which are
supported by suspension insulators, we find where the dead-ending
takes place that instead of the jumper wire being freely suspended by
gravity, as is called for in the claims of the patent in suit, that it is
connected to the line on each side of the cross-arm and outside of the
dead-ended portions and rigidly connected to the conductor by a three-
way clamp at each end into which the vertical end of the jumper at
each side extends and is secured so that there is no pivotal action at
this point, but a purely rigid connection. The jumper is bent at right
angles at the lower end of each vertical part and supported by a series
of insulators underneath the cross-arm. This construction strikes me
as being the direct opposite to a "freely suspended by gravity" jumper.

And lastly, regarding the insulators themselves, it is my opinion

that the patent in suit contemplates the use of insulators with flexible connections; that is, connections which would allow a free lateral swaying of the conductor and free swaying of each unit of the insulator with respect to the other unit. At line 52 of the specifications of the patent in suit we find, "in carrying out our invention, we do away with the usual insulators and their pins and provide at certain of the supporting towers a vertical series of insulators flexibly connected to each other," etc., and in claim 6 "conductor spans freely suspended beneath said cross-arms by series of flexibly connected disk insulators."

The insulators sold by the defendant for use in the Sanitary District were of a different type. They were of the type known as the cap and pin type. The connections between the units of the defendant are rigid pins having a flat head at the lower end fitting in a socket with a cotter pin underneath the flat sides of these heads to prevent the very possibility of lateral swaying. The flexibility contemplated by the patent in suit to exist between each unit of the insulators does not appear to be present in the series of insulators furnished by the defendant.

I think I have pointed out that the two wire addition to the Chicago Sanitary District lines is substantially different from the system contemplated by the patent in four material respects.

The plaintiff adds that there is other evidence of the defendant offering its insulators for sale for the purpose of this patented system and refers to defendant's catalogue published before the commencement of this suit. Therein are illustrated the defendant's insulators in use not only in the Chicago District already referred to, but also in the transmission system of the Hydro-Electric Power Commission of Ontario, a 110,000-volt line, and the 100,000-volt line of the Southern Power Company of Charlotte, N. C. I fail to find, however, that either of these two transmission systems resembled the system contemplated by the plaintiff's patent. The essential features of the plaintiff's system do not appear to be present in either of them. Should the court hold that selling, or offering for sale, insulators for a 100,000-volt system in itself amounts to infringement of a patent which calls for a specified use of those insulators in conjunction with a specified use of the other elements of the combination? I do not think so.

The invention relates to a mechanical arrangement of instrumentalities by the patent description and claims; yet the interpretation asked is that the patent should be construed to cover and necessarily include features not embodied therein.

This I cannot agree to. Not being convinced that this defendant has infringed the patented system of the plaintiff, a decree will be entered dismissing the bill.