## GENERAL ELECTRIC CO. v. OHIO BRASS CO.

(Circuit Court of Appeals, Third Circuit. January 6, 1922.)

No. 2705.

1. Patents ⬤⟶26(1)—Where elements are old, invention must be found in combination.

Where all the elements of the combinations of the claims in suit are old, invention, if any, must be found in the combinations alone.

2. Patents ⬤⟶328—925,561, claims 1 to 4, for high-tension electrical conduction system held anticipated.

The Buck and Hewlett patent, No. 925,561, claims 1 to 4, for a system for high-tension electric transmission, in which the conductor is suspended from the cross-arms by flexible insulators, held void for anticipation.

3. Patents ⬤⟶328—925,561, claim 6, held void for want of invention.

The Buck and Hewlett patent, No. 925,561, claim 6, for a high-tension electric transmission system, in which an insulator covered by another patent is combined with other elements all of which were old, and without which the insulator could not be used, does not disclose invention apart from that disclosed by the insulator patent, and is void.

Appeal from the District Court of the United States for the District of New Jersey; Charles F. Lynch, Judge.

Suit for infringement of patent by the General Electric Company against the Ohio Brass Company. From a decree dismissing the bill (275 Fed. 213), complainant appeals. Affirmed.

Charles Neave, William G. McKnight, and Clarence D. Kerr, all of New York City, for appellant.

Drury Cooper, of New York City, and Charles M. Nissen, of Chicago, Ill., for appellee.

Before WOOLLEY and DAVIS, Circuit Judges, and THOMPSON, District Judge.

WOOLLEY, Circuit Judge. The patent in suit is for a system of suspending electric conductors in power circuits of high potentials. By its bill of complaint the General Electric Company, owner of the patent, charges the Ohio Brass Company with contributory infringement by selling insulators of its own make for use in transmission systems installed by others within the terms of the patent. The issues are invalidity and infringement. The District Court held the respondent not guilty of contributory infringement because it found the systems for which the respondent had furnished insulators did not themselves infringe the patent. 275 Fed. 213. From the decree dismissing the bill the complainant took this appeal.

The art to which the invention of the patent relates is that of electricity. The branch of the art in which the invention claims a place is that of electrical transmission.

Electrical transmission had its rise in the Morse telegraph. In order to transmit electricity from one point to another, resort was had to bare wires carrying feeble currents at low pressure. These wires were stretched on poles, their support being effected and the flow of current maintained by fastening the wires to small glass insulators mounted on wooden pins vertically affixed either upon cross-arms attached to the poles or upon the poles themselves. With the coming of the telephone, involving a like need of electrical transmission at like low pressure, the same expedients were resorted to. But with the advent of the incandescent lamp, electric railways, and wireless telegraphy, and with the corresponding development of the dynamo and motor, there arose a demand for the transmission of electric current in greater volume and at higher pressure. To meet this demand the same expedients of wires and poles were employed and also the same expedients of insulation; the latter, however, being enlarged, increased in number, varied in design and position to meet the behavior of electricity under increasing pressure or voltage. These electrical changes in the march of the art, always involving increase in the size and therefore in the weight of the apparatus of insulation, brought with them corresponding changes in the mechanical construction of the supporting means. To the expedient of poles with cross-arms was added the expedient of high steel towers with cross-arms, used mainly in systems involving the need of heavy insulation or economy of long spans. There also came into systems, whether of poles or towers, the practice of "dead-ending" the line to the pole or tower at a point where it made a turn, whether horizontal in going around a corner or vertical in going over an obstruction or in ascending a mountain. The expedient of dead-ending a live wire included, as its name denotes, the insulation of the wire from the pole or tower to prevent grounding. But dead-ending made an instant call for means of continuing the transmission of current beyond. This need brought into the art another expedient termed "jumper connection." This was a wire connected with the live wire in front of the point at which it had been dead-ended, then jumped over the cross-arm—either above, to the side of, or below the same—to a connection with the live wire, similarly dead-ended, on the other side of the cross-arm, whence the current was transmitted and carried forward.

At this stage of the art Buck and Hewlett, on February 15, 1906, filed in the Patent Office an application for a patent which recited the problems of power circuits of high potentials and disclosed what they conceived to be an invention solving them. In their specification they said:

"The present invention relates to overhead suspension of electric conductors and more especially conductors of power circuits of high potentials.

"Heretofore it has been the standard practice to provide the poles or cross-arms with pins upon which were placed vertical insulators to which the conductors were directly attached. These insulators, in order to adapt them for use with high potential circuits, were made up by superposing a plurality of horizontal petticoats upon each other, the number of such petticoats depending upon the voltages of the currents, and accordingly the in-

sulators for use with currents of very high potential were of great length. Besides being expensive these insulators are objectionable and practically useless on account of the leverage on the insulator and pin becoming so great as to impose stresses on the insulating material. Moreover, when exposed to heavy rain, the drip from one petticoat to the next below it, and so on down, tend to provide a low resistance path for the current so that it often occurs that the petticoats are short-circuited and the current arcs over the insulator to the pole."

### Continuing, the applicants said:

"The object of our invention is to avoid these objections and accordingly we do away with the usual insulators and pins and provide the conductor with flexible insulating tension sections which are directly connected to the cross-arms so that each span of the conductor is dead-ended at each tower or pole and a jumper or connecting loop joined to the conductor at opposite ends of the insulating sections and made of sufficient length to hang clear of the cross-arm."

There were seven claims in this application. The first three provided means for insulating the spans of the conductor by a series of flexibly connected insulating members with dead-ending at *each* pole; the last four were directed to the insulating member, or disc-insulator, itself.

While this joint application was pending, Hewlett alone, on April 20, 1907, applied for a patent for an insulator. By his application he showed two forms of discs flexibly connected in series; discs of one form being the same as the discs of the insulator in the joint application of Buck and himself then pending. Hewlett's sole application also disclosed, not the only way perhaps, but certainly the preferred way, of using the insulator, namely, by dead-ending the conductor at each pole, within the conception of the Buck and Hewlett application. Though clearly adapted to the purpose, nothing was then said about using the flexible insulator as a means to suspend the conductor below the cross-arms of the pole. Seven years later Hewlett was granted Letters Patent No. 1,110,934 for his insulator. Merit in this invention is evidenced by the 900,000 Hewlett insulators in use. But this patent to Hewlett for an insulator is *not* the patent in suit.

We have spoken of the patent to Hewlett for an insulator in order clearly to distinguish it from the patent in suit and finally to exclude it from our decision, because the patent in suit is not for an insulator; it is for a system which in its combination includes an insulator as one of the elements.

The next step in the Patent Office proceedings on the joint application of Buck and Hewlett relevant to this discussion occurred on October 31, 1907. On that day the Patent Examiner, reviewing the claims of the application, found that "the invention, if any, appears to reside in the specific insulators, as the jumper connection system is shown to be old," and thereupon restricted the case to the "specific insulator." Whereupon, Buck and Hewlett filed another joint application for a patent, later permitting their original application to lapse. In due course Letters Patent No. 925,561 were granted Buck and Hewlett (on their second application) for suspension of high-tension lines. This is the patent in suit.

We have found this lengthy preface necessary to an examination of just what the invention of the patent in suit is about.

Turning to the specification of the patent, Buck and Hewlett define the high potentials to which their invention "especially" relates as between 60,000 and 100,000 volts; repeat the practices of the art and the object of their invention in the language of their first joint application, later abandoned; and then show how their invention should be practiced, namely:

"In carrying out our invention, we do away with the usual insulators and their pins and provide at certain of the supporting towers a vertical series of insulators flexibly connected to each other and attached by a hooked joint at the upper end to the under side of a cross-arm of the tower and at the lower end by an ear or other suitable connection to the suspended conductors. At certain other towers the conductor is dead-ended through a horizontal series of flexibly connected insulators on each side of the cross-arm and a jumper connection joins the dead ends of the conductor and hangs freely by gravity below the cross-arm. The dead-ending of the conductor will occur at angles in the conductor in order to take the side stress due to change in direction thereof, and is preferably used at least at every fourth or fifth tower on tangents or straight sections in order to prevent longitudinal waves of the conductor due to wind. The dead-ended arrangement may be employed at all points of suspension where preferred."

The remainder of the specification is devoted to a statement in detail of the structure of the insulator element of the invention. As the invention, differently claimed, involves insulators both in suspending the conductor from a cross-arm and in dead-ending the conductor to a cross-arm, the patentees disclose two kinds of insulators in series; the structure of the insulator shown in Figure 2 of the Buck and Hewlett patent for a system being the same as the structure of the insulator shown in Figures 1 and 2 of the Hewlett patent for an insulator, and the structure of another insulator shown in Figure 3 of the Buck and Hewlett patent being the same as the structure of the insulator shown in Figures 4 and 5 of the Hewlett patent.

Buck and Hewlett Suspension of High-Tension Lines.

Hewlett Insulator.

The relation of the invention of the Hewlett patent to the invention of the patent of Buck and Hewlett and the manner in which the respective patentees intend their inventions should be practiced are shown by the diagrams of the patents reproduced as follows:

Hewlett Insulator.

Buck and Hewlett Suspension of High-Tension Lines.

Fig. 1

In the light of the specification aided by diagrams we now read the claims of the Buck and Hewlett patent in suit. They are claims 1, 2, 3, 4 and 6. Claim 6, regarded by the complainant as "fundamentally descriptive of the novel feature of the invention," is as follows:

"In a system of high-tension line suspension, the combination of towers provided with cross-arms, of conductor spans freely suspended beneath said cross-arms by series of flexibly connected disc insulators."

In this combination of overhead suspension there are three elements: First, towers; second, conductor spans; and, third, insulators of a described kind. Free suspension of the conductor may conceivably be a fourth element, yet it seems more like a natural result of the use of depending insulators. This claim covers suspension by an insulator where the conductor is not dead-ended but where it passes under the cross-arm.

Claim 1 is as follows:

"In a system of high-tension line suspension, the combination of periodically dead-ended spans joined by jumper connections, and intervening spans freely suspended beneath cross-arms of the supporting towers."

The elements of this claim are: First, conductor spans (second) periodically dead-ended with (third) the associated expedient (where the conductor continues farther) of jumper connections, with the result of free suspension of intervening spans. In claim 1, it is observed, there is no element of an insulator.

Between the extremes of claim 1 and claim 6 are inserted claims 2, 3 and 4, which may, for present purposes, be stated as containing the element of insulators flexibly connected in series with freely suspended spans, and dead-ending and jumper connections in different combinations. In these claims the insulators are not described as discs. Unless limited by the specification they may be of any design or shape.

Several defenses to infringement of these claims were raised and tried. Briefly stated they were, noninfringement, on the grounds found by the trial judge (275 Fed. 213), and invalidity, on the ground that the patentees were not the first and original inventors; that they were not joint inventors; that the invention was anticipated; that the invention was but an adaptation of expedients in power currents of low pressure to power currents of high pressure, requiring nothing more than an increase of insulation; and that the combinations do not themselves involve inventive conception. While most of these defenses are debatable—some of them raising grave doubts—we prefer to decide the case on that defense which appeals to us as involving no doubt, namely, the one concerning the fundamental issue of inventive conception.

[1] On this issue the complainant concedes that, with qualifications, all elements of the combinations of the claims in suit are old. Therefore, it is certain that invention, if any, must be found in the combinations alone. Leeds & Catlin v. Victor, 213 U. S. 325, 332, 333, 29 Sup. Ct. 503, 53 L. Ed. 816. We understand that the complainant does not deny that the combinations themselves were, in their essentials, found in systems of lower potentials and in systems of higher potentials, the former exemplified by railways and the latter by wireless telegraphy. But the complainant says that in determining invention in the patent there should not be charged against it like combinations in systems with extreme potentials because of great differences in the problems of the several systems. But these differences, we are constrained to believe, are electrical differences with corresponding mechanical differences of weight and strain, solved by insulators designed with reference to both. We are prompt to see that these differences have a bearing on invention of an insulator,—as for instance, the transformation from a rigid vertical insulator to a suspended flexible insulator,—but we are slow to see that they bear on invention in a system where electrical problems and their correlative mechanical problems are solved by the insulators themselves.

Much of the great volume of testimony on insulation in this immense record, and indeed much of the argument on that subject, we regard as not pertinent to the issue, because the patent is not for an insulator. It is for a system of suspending conductors by insulators. Yet in the system of the patent, one claim describes quite plainly an insulator covered by the Hewlett patent or insulators of its type; and other claims describe flexible insulators generally; and still another claim includes no insulator at all.

[2] In searching for invention in these claims we first regarded them as though they intended no reference to the Hewlett flexible insulator,

or to disc insulators of that type, but intended generally insulators of whatever shape which are flexibly connected in series. Looking from this viewpoint we found in systems of both low and high potentials in the prior art insulators in series rigidly connected, movably connected, and flexibly connected; also conductors suspended by insulators flexibly connected in series; and in one striking instance we found such insulators in combination with all other elements of claims 2, 3 and 4. This finding also includes within it the narrower combination of claim 1.

The instance referred to was this: In 1900 it became necessary on Washington street, in Indianapolis, to run a feeder line to augment the power of a trolley line. The poles of the line had their cross-arms so filled with pin insulators carrying lines in use that it was impracticable to place upon them any more lines. So, doing what seems to have been an obvious expedient in the circumstances, the workmen hung from the cross-arm of each pole two "globe insulators" flexibly connected in series by which the new conductor was suspended. They also dead-ended the wires at every fifth pole—the precise "periodical" dead-ending of the patent—with jumper connections suspended by gravity underneath the cross-arm on each side of a dead-end, resulting in free suspension of the intervening conductor spans. The reason for suspending the new conductor in the Indianapolis line, instead of mounting it on rigid pins, was precisely the same as in the Chicago Sanitary District line, here charged as infringement, namely, there was no room on top of the cross-arms for more pin insulators, so the line was hung beneath the arms.

But the complainant says the Indianapolis system was of low potential. It was, relatively so. Yet its problems, electrical and mechanical, were different only in degree from those in a system of high potential. That difference is cared for by insulators and their related expedients. But if it were not, still we fail to discern invention in the mere adaptation of this Indianapolis system of low potential to the complainant's system of high potential.

We are of opinion, therefore, that within the general description of the element of an insulator, the invention of the patent in suit was anticipated. On this ground, as well as on the ground which will control our decision on claim 6, we hold claims 2, 3 and 4 invalid. It follows on the same evidence that claim 1 is invalid.

[3] As the insulator in the combination of claim 6, particularly described in the specification and displayed in the diagrams, is the insulator of the Hewlett patent, or an insulator distinctively of its type, we have the question whether the Hewlett insulator, or one falling within its description, can in combination with common expedients of the art be the subject of invention.

Turning to claim 6, we find, as we have said before, the invention to be a combination of three elements: First, towers provided with cross-arms; second, an electric conductor; and, third, disc insulators flexibly connected in series supporting the conductor, thereby producing as a result its free suspension. "Towers provided with cross-arms" were not new. At any rate they are the equivalent of poles with cross-

arms. Poles with cross-arms are an expedient of the art as old as the art itself. Current conductors, of course, are an expedient as old as poles. The only other element is the insulator, and that insulator is intended for use only in suspended connection between cross-arm and conductor. Thus there is a combination which embodies a specific element of suspended insulator in assemblage with expedients of the prior art, which together produce no function other than that which the suspended insulator would itself produce when in operation with these ordinary expedients of the art.

The insulator described in claim 6, whether specifically the insulator of the Hewlett patent or generally an insulator of the Hewlett type, is adapted for both horizontal dead-ending insulation and for suspension insulation. Whether used for one purpose or the other, or for both purposes, such an insulator in overhead suspension can be used —so far as we have been shown or can imagine—only in connection with the very expedients of the art named as elements of the patent combination. At least, claim 6 discloses use of the insulator only with these expedients. There must be a tower or pole with a cross-arm from which to suspend the flexible insulator at one end and a current conductor to be appended to the insulator at its other end. Without these two expedients the insulator cannot work. This being true, can there be invention in a combination of three elements, when two of them, separately free to everyone, are indispensable to the functioning of the third? Or, stated differently, is there invention in a combination which produces no result other than that produced by one of its elements operating in the only way possible for it to operate—that way being through expedients common to the art? Reading claims 6, 2, 3 and 4,—all combinations,—we find, described as an element in each, an insulator of a specific type (claim 6), and an insulator of a more general type (claims 2, 3 and 4), in combination with expedients appropriated from the art without which insulators of neither type can function. The complainant says here is invention. With this we cannot agree because: First, we do not find a combination which in the patent sense is new. Nor can we find such a combination useful beyond that of the insulator itself with the expedients of the art open to it—expedients without which the insulator is useless. If such a combination constitutes invention, then, if patented, use of the common expedients of the art—poles and conductors—would be foreclosed to every one seeking lawfully to use insulators of their own which happen to fall within the class of the insulator elements of the claims. Of such insulators there are numbers patented and extensively used in the art.

As drawn, the patent to Buck and Hewlett grants them not merely a monopoly of a system of electrical transmission, but, in effect, expands the Hewlett patent for an insulator and permits it to embrace, and monopolize, the named expedients of the art, thereby bringing about infringement whenever these expedients are used in combination with insulators of others, which, though not infringing the Hewlett insulator, fall within its broad description. The Buck and Hewlett patent for a system, built around the Hewlett insulator, pretty nearly,

if not entirely, covers the whole art, present and perspective, of insulators in series flexibly connected, whether the insulating members be discs, globes, or other shapes.

We are constrained to hold the claims of the patent in suit invalid and direct that the decree below dismissing the bill be affirmed.